UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| TERRY CARNELL PALMER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:13-CV-190-BG |
| | ) | ECF |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Terry Carnell Palmer, Jr., seeks judicial review of a decision of the Commissioner of Social Security denying his application for supplemental security income (SSI). The United States District Judge transferred this case to the undersigned United States Magistrate Judge for further proceedings. In accordance with the order of transfer, the undersigned now files this Report and Recommendation.

**I.   Statement of the Case**

Palmer protectively filed his current SSI application on February 23, 2011. His claim was denied initially and on reconsideration, and he thereafter requested a hearing before an administrative law judge (ALJ). On June 11, 2012, Palmer, a witness, and a vocational expert testified at a hearing before an ALJ. Palmer was represented by an attorney at the hearing. The ALJ determined on July 10, 2012, that Palmer was not disabled because he could perform jobs that exist in significant numbers in the national economy. The Appeals Council denied review on July 9, 2013. Following denial of a request for review, the ALJ's decision becomes the Commissioner's

final decision and is properly before the court for review. *Sims v. Apfel*, 530 U.S. 103, 107, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000); *see also Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005) (holding the Commissioner's final decision incorporates the Appeals Council's denial of a claimant's request for review).

## II.  Factual Background

Palmer claims that he became disabled due to hypertrophic obstructive cardiomyopathy and obesity.[1] (Tr. 64, 117.) He claims that a heart condition and frequent fainting, dizzy spells, and right leg pain prevent him from working. (Tr. 52, 58–59.) He is 6 feet, 2 inches tall, and weighs 360 pounds. (Tr. 51.) He was 21 years old at the time of filing his application, and he lives with his parents. (Tr. 54, 117.) He has a high school education, during which he attended special education classes. (Tr. 51, 141.) He does not have any prior work history except for one summer position when he cleaned the grounds at an automotive shop for approximately one month. (Tr. 48–50.)

## III.  Standard of Review

A court reviewing the Commissioner's denial of disability insurance benefits is limited to determining (1) whether the decision is supported by substantial evidence in the record and (2) whether the Commissioner applied the proper legal standards. *See* 42 U.S.C. § 405(g) (2014); *see e.g.*, *Higginbotham*, 405 F.3d at 335. "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Without reweighing the evidence or substituting its own judgment, a reviewing court must examine the entire record,

---

[1] Hypertrophic cardiomyopathy is defined as thickening of the ventricular septum and walls of the left ventricle with marked myofibril disarray; often associated with greater thickening of the septum than of the free wall resulting in narrowing of the left ventricular outflow tract and dynamic outflow gradient. Stedman's Medical Dictionary 313 (28th ed. 2006).

including evidence favorable to the Commissioner as well as contrary evidence. *See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If the Commissioner's findings are supported by substantial evidence, they are treated as conclusive and will be affirmed. *See Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971).

## IV. Discussion

Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). In making a disability determination, the Commissioner conducts a five-step sequential evaluation to determine whether: (1) the claimant is currently working; (2) the claimant has a "severe impairment"; (3) the impairment meets or equals an impairment listed in Appendix 1 of the regulations; (4) the claimant is capable of performing past relevant work; and (5) whether the claimant, after taking into account age, education, previous work experience, and residual functional capacity, is capable of performing any other work. *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); 20 C.F.R. § 416.920(a)(4) (2014). If a disability determination is made at any step in the process, the finding is conclusive and the analysis terminates. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

At the first four steps in the analysis, the claimant bears the burden of proof. *Id.* Once this burden is satisfied, the Commissioner bears the burden of showing the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* After making such a showing, the burden shifts back to the claimant to rebut the Commissioner's finding. *See Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

In this case, the ALJ determined: (1) Palmer was not currently engaged in substantial gainful activity, (2) Palmer's impairments—hypertension; a history of left ventricular hypertrophic cardiomyopathy; a history of right knee, right leg, and right foot pain possibly attributable to neuropathy; and morbid obesity—were severe in nature, and (3) Palmer did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 21.) Following step three, the ALJ assessed Palmer's residual functional capacity (RFC) and found that he had the RFC to perform simple sedentary work. (Tr. 28.)

At step four, the ALJ found that Palmer had no past relevant work to which he could return. (Tr. 28.) After considering testimony from a vocational expert and Palmer's RFC, age, education, and vocational background, the ALJ concluded at step five—using the Medical-Vocational Guidelines as a framework—that Palmer was capable of performing other jobs that exist in significant numbers in the national economy. (Tr. 29.) Palmer argues on appeal that the ALJ erred by (1) failing to find that his impairments met or medically equaled Listing § 4.02 and (2) failing to obtain a medical consultant with experience in cardiology to review his case history and determine if an Exercise Tolerance Test (ETT) was warranted. Pl.'s Br. 2, 12.

**A.    The ALJ properly determined that Palmer did not meet the requirements of Listing § 4.02.**

Palmer first contends that his medical conditions meet Listing § 4.02 for chronic heart failure. If an adult claimant is not working and his impairment meets or is equivalent to one of the listed impairments, a presumption of disability applies and the claimant qualifies for benefits without further inquiry into the claimant's age, education, and work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990); 20 C.F.R. § 416.920(d). Diagnosis alone is insufficient to meet the requirements of a listed impairment. *See Sullivan*, 493 U.S. at 530. In order

4

to meet or equal a listing, a claimant bears the burden of providing medical findings that satisfy all of the stated criteria for that listing. *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).

Listing § 4.00(D) provides the relevant defining characteristics of chronic heart failure (CHF) and the evidence required to establish CHF. § 4.00(D)(1), (2). CHF is defined as the inability of the heart to pump enough oxygenated blood to body tissues; the two main types of CHF are predominant systolic dysfunction (systolic failure) and predominant diastolic dysfunction (diastolic failure). § 4.00(D)(1). The listing defines "diastolic failure" as the inability of the heart to relax and fill normally, which is characterized by a thickened ventricular muscle, poor ability of the left ventricle to distend, increased ventricular filling pressure, and a normal or increased ejection fraction. § 4.00(D)(1)(a)(ii). Under Listing § 4.02, a claimant on a regimen of prescribed treatment for CHF—having the symptoms and signs described in § 4.00(D)(2)—satisfies the required level of severity when he meets the requirements of both paragraphs A and B:

A. Medically documented presence of one of the following:
   1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
   2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure); AND
B. Resulting in one of the following:
   1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
   2. Three or more separate episodes of congestive heart failure within a consecutive 12-month period . . . ; or
   3. Inability to perform on an exercise tolerance test at a workload

>    equivalent to 5 METs or less due to:
>    a.    Dyspnea, fatigue, palpitations, or chest discomfort; or . . . .

20 C.F.R. § 404, subpt. P, app. 1 § 4.02(A), (B).

In his assessment, the ALJ stated that the objective medical evidence failed to establish that Palmer's impairments met or equaled a listed impairment, including § 4.02. (Tr. 24–25.) Palmer asserts, however, that his diagnosis of ventricular hypertrophic cardiomyopathy meets or equals Listing § 4.02. Pl.'s Br. 13. He claims that he meets the criteria for diastolic failure under § 4.02(A)(2), which requires diastolic failure "with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability." § 4.02(A)(2).

In support of his claim, Palmer points to an echocardiogram performed on March 10, 2011. (Tr. 218–19.) The results found that Palmer's intraventricular septal thickness was 1.5 cm during diastole and 1.8 cm during systole. (Tr. 218.) His left ventricular wall measured 1.3 cm during diastole and 2.1 cm during systole. *Id.* Added together, his combined measurements were 2.8 cm and 3.9 cm, respectively, exceeding the 2.5 cm requirement. *Id.* His left atrium measured 4.4 cm, or 0.1 cm below the minimum requirement of 4.5 cm for an enlarged left atrium under the listing, and was characterized as "mild left atrial enlargement." (Tr. 218–19.) His ejection fraction was within the normal range. *Id.* In this regard, Palmer meets some of the initial requirements for the listing, although his left atrium measurement is 0.1 cm below the specified criteria.

For the requirements of § 4.02(B), Palmer does not put forth medical evidence establishing that he meets the criteria; he instead contends that he may meet the requirements as determined by an Exercise Tolerance Test (ETT), if he were to have an ETT performed. Pl.'s Br. 14–15. In this regard, Palmer claims that the ALJ should have enlisted a medical consultant with experience in

6

cardiology to review his medical history and determine if an ETT was warranted. Pl.'s Br. 15. Under § 4.00(C)(6), the regulations specify that the Social Security administration will consider purchasing an ETT: (1) when there is a question of whether the claimant's cardiovascular impairments meet the severity of one of the listings, or (2) when assessing the claimant's RFC and there is insufficient evidence in the record to make a determination. *See* §§ 4.00(C)(6)(a)(i), (ii). The regulations further state: "We will not purchase an exercise test when we can make our determination or decision based on the evidence we already have." § 4.00(C)(6)(b).

Here, the evidence was sufficient to enable the ALJ to make a determination and substantial evidence supports his determination that Palmer did not meet the requirements of Listing § 4.02. In October and November 2007, x-rays of Palmer's chest found no acute or active cardiopulmonary disease radiographically. (Tr. 457, 498.) In January 2008, a portable chest radiograph showed Palmer's heart, mediastinum, and great vessels were within normal limits. (Tr. 291.) In March 2008, chest x-ray impressions included "stable cardiomegaly without failure." (Tr. 282.) On March 28, 2011, Ashwani Kumar, M.D., performed a left ventriculography and coronary and renal artery angiograms—procedures to visualize the left ventricle and arteries. (Tr. 403–05.) The post-operative impressions found no significant coronary artery disease, and Palmer was diagnosed with hypertension with hypertensive heart disease. (Tr. 403–04.) Chest x-rays taken on May 2, 2011, again revealed no acute cardiopulmonary abnormality. (Tr. 211.) Later in May 2011, Palmer returned to Dr. Kumar complaining of chest pain. (Tr. 366.) Palmer's blood pressure medications were changed, and he was instructed to follow-up in six months. (Tr. 368.)

Palmer's medical history demonstrates continued complaints of chest pain and treatment for hypertension; however, the record does not support a finding of listings-level chronic heart failure.

On the contrary, multiple physicians found no acute cardiopulmonary abnormality when reviewing his chest x-rays. "An impairment that manifests only some of [the listed] criteria, no matter how severely, does not qualify." *See Sullivan*, 493 U.S. at 530–35 (noting the Commissioner explicitly set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard); *see also Greenspan*, 38 F.3d at 236 (noting the claimant bears the burden of proof at the first four steps of the sequential evaluation process). Because substantial evidence supports the ALJ's finding that Palmer does not meet the requirements for a listed impairment, the ALJ was under no obligation to purchase an ETT. *See* § 4.00(C)(6)(a)(i).

      **B.**    **The ALJ properly developed the record and acted within his discretion in declining to order an Exercise Tolerance Test.**

After determining that Palmer did not meet the requirements for a listed impairment, the ALJ went on to assess Palmer's RFC, or the most that he can still do despite his impairments. *See* 20 C.F.R. § 416.945(a) (defining residual functional capacity). Palmer again contends that the ALJ failed to properly develop the record when assessing his RFC by not consulting a medical expert or ordering an ETT. Pl.'s Br. 15–17; Pl.'s Reply Br. 6–7. An ALJ is obligated to fully and fairly develop the record in order to ensure an informed decision based upon sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *see also* § 4.00(C)(6)(a)(ii) (noting the Commissioner will consider purchasing an ETT when assessing a claimant's RFC if there is insufficient evidence in the record to make a determination). An allegation that the ALJ failed to fully and fairly develop the record is an issue of substantial evidence. *See Brock*, 84 F.3d at 728. In order for remand to issue, the claimant must show "(1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby." *Id*.

Substantial evidence supports the ALJ's determination that Palmer was capable of performing simple sedentary work. (Tr. 28.) The ALJ thoroughly detailed Palmer's medical history. (Tr. 21–23.) He noted that the record contained no evidence that Palmer had sought treatment for syncope after the date on which he protectively filed his current SSI application. (Tr. 24, 27, 29.) He further noted an absence of coronary artery disease within Palmer's treatment history. (Tr. 27, 366, 403–05.) After undergoing the coronary angiogram, the plan of treatment outlined by Palmer's cardiologist included medication for hypertension and routine chest x-rays. (Tr. 368.) In August 2011, Palmer visited the emergency room with complaints of a one-month history of a burning sensation to his central chest and a four-day history of central abdominal pain and left ear pain. (Tr. 396.) He was diagnosed with gastritis and swimmer's ear and released. (Tr. 399.) Palmer did not again seek medical treatment until May and June 2012, when he visited a nurse practitioner for right foot pain and symptoms of depression. (Tr. 407–09, 541–43.)

In assessing Palmer's RFC, the ALJ found that Palmer's testimony was not reasonably supported by the objective medical evidence to the extent that he alleged an inability to perform any work activity. (Tr. 25–27.) Despite Palmer's testimony that his condition prevents him from engaging in any physical exertion, the record shows that clinicians repeatedly encouraged him to exercise. (Tr. 21–23, 27, 53–54, 297, 409, 415, 542.) The ALJ observed that on his initial application Palmer reported engaging in a wide range of activities of daily living—taking out the trash, washing dishes, folding laundry, and playing video games—but during the hearing he testified that he no longer participates in any of these activities and remains confined to his bed. (Tr. 25–27, 55–56, 130–31.) *See Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990) (noting inconsistencies between the claimant's testimony regarding his limitations and his reported daily activities were a

9

relevant consideration in the evaluation of his credibility).

In his physical residual functional capacity assessment, consulting physician Laurence Ligon, M.D., found that Palmer's clinical exams were negative for signs of heart failure and found that Palmer could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, or sit for about 6 hours in an 8-hour workday. (Tr. 332.) Dr. Ligon therefore concluded that Palmer retained the ability to perform light work. *See* 20 C.F.R. § 416.967(b) (defining light work as lifting no more than 20 pounds, frequently lifting 10 pounds, and requiring a good deal of walking and standing). The ALJ, in contrast, limited Palmer to sedentary work, which involves lifting no more than 10 pounds at a time, with only occasional walking and standing. (Tr. 28.) *See* § 416.967(a) (defining sedentary work); *see also* § 416.967(b) (noting if someone can do light work, he can also do sedentary work unless there are additional limiting factors). The ALJ further limited Palmer to "simple work" in light of his history of attending special education classes, although he noted an absence of evidence of cognitive deficits. (Tr. 28.)

Because the evidence shows that the ALJ fully developed the record and substantial evidence supports his RFC determination, the ALJ acted within his discretion in declining to consult a medical expert and, further, was under no obligation to purchase an ETT. *See* SSR 96-6p, 1996 WL 374180, at *3–4 (noting an ALJ must obtain an updated medical opinion from a medical expert in certain circumstances when reaching a decision of disability based upon medical equivalence to an impairment in the listings of impairments); *see also* § 4.00(C)(6)(b) ("We will not purchase an exercise test when we can make our determination or decision based on the evidence we already have."). In sum, the ALJ did not commit reversible error in this case.

**V.     Recommendation**

For the foregoing reasons, the undersigned recommends that the United States District Court affirm the Commissioner's decision and dismiss Palmer's Complaint with prejudice.

**VI.    Right to Object**

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy.  28 U.S.C. § 636(b)(1) (2014); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to timely file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated:       July 14, 2014.

_____
NANCY M. KOENIG
United States Magistrate Judge

11